STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

FRANK J. RIEBLI (CABN 221152)
ERIC CHENG (CABN 274118)
Assistant United States Attorneys
  450 Golden Gate Avenue, Box 36055
  San Francisco, California 94102-3495
  Telephone: (415) 436-7200
  FAX: (415) 436-7234
  Frank.Riebli@usdoj.gov
  Eric.Cheng@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 21-CR-274 CRB |
| Plaintiff, | ) |
| | ) UNITED STATES' SENTENCING |
| v. | ) MEMORANDUM |
| | ) |
| IAN BENJAMIN ROGERS, | ) Date: September 28, 2022 |
| | ) Time: 10:00 a.m. |
| Defendant. | ) |

## I. INTRODUCTION

After the November 2020 Presidential election, defendant Ian ROGERS and his co-defendant Jarrod Copeland began to plan a series of violent attacks against targets associated with the political party they opposed. Although they understood that they would be viewed as domestic terrorists for their conduct, they hoped that their violent acts might start a movement to overthrow the government, or at least strike back at the government for what they viewed as the unfair treatment of political opponents like themselves.

So ROGERS and Copeland developed a plan to attack the Democratic Party headquarters in Sacramento and burn it to the ground, and then move on to other targets (including two social media companies they despised). By the end of November, they had worked out many of the details of the plan. The January 6, 2021 attack on the Capitol energized them, and they waited to see whether the inauguration on January 20, 2021 would go forward before initiating their attacks.

Fortunately, the FBI and the Napa County Sheriff executed search warrants at ROGERS's home and business, and arrested him just five days prior to the inauguration. In the course of that search, they seized almost 50 firearms, including four fully automatic machine guns, approximately 15,000 rounds of ammunition, and five fully assembled pipe bombs.

The government charged ROGERS with conspiring to destroy a building—the Democratic Party headquarters in Sacramento—by fire or explosive (in violation of 18 U.S.C. §§ 844(i) and (n)), possession of machine guns (in violation of 18 U.S.C. § 922(o)), and possession of unregistered explosive devices (the pipe bombs) (in violation of 26 U.S.C. § 5861(d)). On May 27, 2022, ROGERS pleaded guilty to the conspiracy charge, one of the machinegun charges, and the pipe bomb charge in a binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C).

ROGERS's binding plea agreement set forth a sentencing range of 84–108 months (7–9 years) of imprisonment. For the reasons below, the government recommends the high end of that agreed-upon range—a 108-month (9-year) sentence of imprisonment, followed by three years of supervised release. Probation also recommends that the Court sentence ROGERS to the same: 108 months of imprisonment, within the parties' agreement on the sentencing range. *See* Presentence Investigation Report (Dkt. No. 66) ("PSR").

## II.     BACKGROUND

### A.     Factual Background

Before his arrest, ROGERS operated an auto repair shop in Napa, California. PSR ¶ 79. He also lifted weights, abused steroids, and amassed an arsenal of weapons and home-made explosives. PSR ¶¶ 9–11; 23. After the 2020 Presidential election, ROGERS was upset with the outcome and began planning for violent attacks against the Democratic Party in order to, in essence, scare them out of political engagement. PSR ¶¶ 12–13. The planning began on November 25, 2020. *Id.* Though ROGERS and Copeland used regular SMS text messages for many of their communications, they used an encrypted messaging application for this exchange:

| | |
|---|---|
| Rogers | Ok bro we need to hit the enemy in the mouth |
| Copeland | Yeah so we punch soros |
| Rogers | I think right now we attack democrats |
| Rogers | They're offices etc |
| Rogers | Molotov cocktails and gasoline |
| Copeland | We need more people bro |
| Copeland | Gonna be hard |

\* \* \*

| | |
|---|---|
| Rogers | Any thoughts on our first target? |
| Rogers | I think we should hit the Governors Mansion its empty no casualties |
| Rogers | Would send a message |
| Copeland | That's the best target I think too |

\* \* \*

| | |
|---|---|
| Rogers | Any idea how to take it down? Either fire bomb or full auto ak fire |
| Rogers | I'm thinking full auto fire with fire will send the message we want |
| Rogers | We shoot it up and burn it down , WOLVERINES |
| Copeland | I think we don't use bullets just burn it down |
| Copeland | No ammo |

*Id.* They continued the discussion two days later.

While ROGERS originally suggested that they target the California Governor's mansion, he shifted his focus to the Democratic Party headquarters in Sacramento, California. *Id.* On November 27, 2020, ROGERS sent Copeland a link to a map detailing the location of the Party headquarters. PSR ¶ 13. That map is depicted below:

ROGERS and Copeland then had the following exchange showing detailed planning by ROGERS, again using an encrypted messaging application:

| | | |
|---|---|---|
| Rogers | Numero uno | |
| Copeland | Right next to CHP | |
| Copeland | gotta be cautious | |
| Rogers | Only take 3 minutes | |
| Rogers | Take a brick break a window pour gas in and light | |
| Copeland | Yeah still though | |
| Rogers | I think I'll do a drive bye and unload a couple drums into that commie building | |
| Copeland | Lol | |
| Rogers | Quick and easy and a fire department is near bye so I don't think a fire will be effective | |
| Rogers | 150 rounds shot into building will destroy it | |
| Copeland | Yeah true | |
| Rogers | And a couple pipe bombs | |
| Copeland | That pipe bomb that shit | |

*Id.* The next day, ROGERS again raised the topic of attacking the Party headquarters, and again he used the encrypted messaging application:

| | | |
|---|---|---|
| Rogers | So I've been thinking about that target in Sacramento , because the chipy station is so close we should fire bomb the place that will be quiet | |
| Rogers | But I'm thinking a keg of gas like 17 gallons of gas | |
| Copeland | Yeah no bullets | |
| Copeland | That's a better plan | |
| Rogers | Guns are too loud with that chippy station so close | |
| Rogers | 17 gallons of gas that place will burn good | |

PSR ¶ 14. ROGERS and Copeland continued to discuss the plan over the next couple days. On November 29, 2020, ROGERS initiated the conversation, on the encrypted app:

| | | |
|---|---|---|
| Rogers | After work tomorrow I'll got to sac and do some recon | |
| Copeland | Really? | |
| Rogers | I'll scope things out take pictures | |

| | | |
|---|---|---|
| | Rogers | I had a better idea , 4x 5 gallon gas can plastic you can buy anywhere break a window throw them inside and light boom |
| | Rogers | I'll be in and out in probably 3 minutes |
| | Copeland | That sounds good bro but let's just take it day by day wait until we see what Trump has planned |
| | Copeland | If we see he can't win we strike |
| | Rogers | I'll do some recon and get ready |
| | Copeland | Ok bro |

PSR ¶ 15. On November 30, 2020, ROGERS again raised the issue:

| | | |
|---|---|---|
| | Rogers | Let's see what happens if they steal the election let's hit Sacramento it will be fun |
| | Rogers | I'm so ready to attack those fucks |
| | Rogers | I have the plan down pat |
| | Copeland | Ok bro let's wait and see |
| | Copeland | If they don't listen to trump they will hear us |
| | Rogers | Roger |
| | Rogers | We need to hit those scumbags |
| | Copeland | Yep |
| | Rogers | Roger |
| | Rogers | We hit that office people might wake up |
| | Copeland | I think it will take more than that and we will get tagged as domestic terrorists |
| | Rogers | Like I care what we are labeled |
| | Rogers | We are right they are wrong period |
| | Rogers | 75 million people are pissed so we act out so what |
| | Rogers | I just hope our actions will make others to get involved , we need help , that's all I hope for |
| | Copeland | [thumbs up emoji] that's what every patriot hopes |
| | Rogers | Let's see what happens but I'm ready to strike , to be honest I've had enough of those assholes, they need to have some payback |
| | Rogers | Wolverines!!! |

PSR ¶ 16.

The next day, ROGERS asked Copeland, "Do you think something is wrong with me how I'm excited to attack the democrats?" ROGERS also mentioned his plan to his former sister-in-law. He told her, "I want to hit the Democratic office in Sacramento". "Ugh it won't do any good," "You'll get caught," she warned. "You gotta get that out of your head" she said. PSR ¶ 17.

As the January 6, 2021 certification of the election results drew near, ROGERS and Copeland again discussed their plan and the reasons for taking action. PSR ¶ 18. On January 4, 2021, they had the following exchange, initially using SMS, and then switching over to an encrypted messaging application ("our secure way"):

| | | |
|---|---|---|
| | Copeland | Well it will probably happen and we will become outlaws for real |
| | Copeland | I've accepted it |

| | | |
|---|---|---|
| | Rogers | I can't take 2 stolen elections in a row |
| | Copeland | I got my zip tie handcuffs in today just in case got a 10 pack |
| | Rogers | Are we the only patriots in the nation? |
| | Rogers | I don't get this? It's baffling |
| | Rogers | We might have to be the ones to wake people up, everyone else are pussys and sleep |
| | Copeland | There are some in our group |
| | Rogers | I just don't know how to fight such powerful people |
| | * * * | |
| | Copeland | It's gonna be hard |
| | Copeland | Gotta [be] smart |
| | Rogers | We have so many enemy's |
| | Rogers | I think the only answer is guerilla warfare |
| | Rogers | Surgical strikes to each infrastructure |
| | Copeland | Heads must be taken |
| | * * * | |
| | Copeland | I don't like to think it but I think we will have to die for what we believe in |
| | * * * | |
| | Rogers | We need help though and I don't know how to get more people involved |
| | Rogers | We would need thousands of people |
| | Copeland | Proud boys and 3% |
| | Copeland | I emailed proud boys |
| | Rogers | Let's talk more in person and our secure way |
| | Copeland | Copy |

PSR ¶ 18.

In that part of the conversation, Copeland said he had gotten a 10-pack of zip tie handcuffs "just in case." Law enforcement seized that 10-pack of handcuffs from him when they searched his residence on July 14, 2021. In addition, Copeland told ROGERS that he had emailed the Proud Boys, in response to ROGERS's statement that they needed to enlist more people to join them in forming a force for guerilla warfare. *Id.* Evidence on Copeland's computer revealed that he contacted—or tried to contact—the Proud Boys through their website on December 28, 2020. When ROGERS and Copeland switched over to their encrypted messaging application, they continued the conversation of enlisting others:

| | | |
|---|---|---|
| | Rogers | We need to recruit more people bro |
| | Rogers | You and I can only do so much |
| | Copeland | I know |
| | Copeland | I'm working on it |
| | Rogers | Roger |
| | Rogers | I just can't believe more people are not as fired up as we are it's baffling |
| | Copeland | They are puss |
| | Copeland | We are not |
| | Copeland | People are scared man |
| | Copeland | I mean we will have to fight the mass |

| | | |
|---|---|---|
| | Copeland | We are severely outnumbered |
| | Rogers | We are but we are willing to fight they are not |
| | Copeland | True |
| | Copeland | But they will turn the police against us |
| | Rogers | Well it comes down to this do we obey the constitution or bullshit ? |
| | Rogers | The constitution has weight , elected ASSFACE's don't |
| | Copeland | True |
| | Copeland | But remember WE ARE THE OUTLAWS |
| | Copeland | civil war is the only option |
| | Rogers | Outlaws and freedom fighters are the same thing depending on your viewpoint |
| | Rogers | That's a fact |
| | Rogers | And also terrorists |
| | Rogers | But in reality we are patriots |

PSR ¶ 18.

On January 10, 2021, ROGERS again raised the topic of attacking Democrats. PSR ¶ 21. As before, he used an encrypted messaging application to carry on the discussion. *Id.* ROGERS told Copeland, "We can attack Twitter or the democrats you pick" and "I think we can attack either easily" shortly after Twitter had suspended Donald Trump's Twitter account. *Id.*

The next day, January 11, 2021, ROGERS started the conversation again:

| | | |
|---|---|---|
| | Rogers | I want to blow up a democrat building bad |
| | Copeland | Lol |
| | Copeland | I know |
| | * * * | |
| | Rogers | The democrats need to pay |
| | Copeland | It's gonna crash bro |
| | Copeland | Corporate America is gonna die |
| | Rogers | Let's see what happens, if nothing does I'm going to war |
| | Rogers | Democrats, Twitter, etc |
| | Rogers | I hope 45 goes to war if he doesn't I will[1] |
| | Copeland | I'm with you |
| | Copeland | So is America bro we are just waiting |
| | Rogers | Let's see what happens then we act |
| | Copeland | Copy |
| | Copeland | I'm with you brother |
| | Rogers | I'm thinking sac office first target |
| | Rogers | Then maybe bird and face offices |
| | Rogers | Sad it's come to this but I'm not going down without a fight |
| | Rogers | These commies need to be told what's up |
| | Copeland | I agree |
| | Copeland | Plan attack |
| | Rogers | Let's see what happens then we act |

---

[1] "45" appears to be a reference to Donald Trump, the 45th President of the United States.

*Id.*

Law enforcement arrested ROGERS on January 15, 2021, just five days before Inauguration Day. PSR ¶ 11. They had received an anonymous tip that ROGERS was stockpiling weapons, including illegal machine guns. PSR ¶ 7. During the search of ROGERS's home and business, law enforcement located five completely assembled pipe bombs and approximately 48 firearms, four of which appeared to be fully automatic. PSR ¶ 11. ROGERS was arrested on weapons charges. *Id.*

During a videotaped interview after ROGERS' arrest, a Napa Sheriff's detective asked him if he had any plans to attack anyone. PSR ¶ 11. ROGERS said, "I've thought about it. I've thought about fighting against, fighting back against the government. But it's always when I'm inebriated. You wake up and you go, 'It's not a good idea.'" *Id.* The detective then asked if ROGERS had any specific plans to do that, and ROGERS responded, "Just, you know, just thoughts. But then you think about what can you do? I don't want to hurt anybody, you know. I mean **maybe if you could attack the right people**, you know, but you don't want to hurt an innocent person" (emphasis added). He went on, "Like people, like you know, people who are really causing problems in this world, like George Soros. I mean, you know, it's kind of **satisfying to think about hurting some scumbag like that**" (emphasis added). *Id.*

Additional messages between ROGERS and Copeland evince just how serious they were. On January 8, 2021, they had the following exchange via text messaging:

| | |
|---|---|
| Rogers | Are you ready? |
| Copeland | I have the gear and the toys so yeah, mentally yeah I'm there I believe |
| Rogers | Are you ready to leave your wife? |
| Rogers | What I'm talking about we probably will die unfortunately |
| Copeland | That's what bothers me, I take care of her so yeah that is hurting me |
| Copeland | When I'm gone the[n] what will she do? |
| Copeland | She has finally came around to understanding |
| Rogers | Especially they will say we are terrorists |
| Copeland | She was crying yesterday and said to me 'please don't leave me I don't know what to do without you' she was rubbing my back while I was watching events from the capitol |
| Copeland | She knows how I am and she knows I will put myself in harms way for what I believe in |
| | [ROGERS then re-iterated they both might die] |
| Copeland | Yeah no more talk on here delete |

PSR ¶ 20. This exchange began over ordinary SMS text messaging, not the encrypted messaging app used on other occasions. That's why, at the end, Copeland told ROGERS they shouldn't talk about it

any further using SMS and that they should delete their messages. ROGERS didn't delete his messages.

During the search of ROGERS's home and business on January 15, 2021, police seized five fully-assembled pipe bombs from a gun safe at ROGERS's business. PSR ¶ 9. The pipe bombs were constructed from lengths of metal pipes, capped at both ends, and filled with gun powder. *Id.* Each pipe bomb had a fuse protruding through one end cap. *Id.* ATF records indicate that ROGERS did not register any of the pipe bombs to himself in the National Firearms Registration and Transfer Record. *Id.* In his post-arrest interview, ROGERS admitted that he had built the pipe bombs. PSR ¶ 11.

His text messages with other people also indicated the purpose of the pipe bombs. As described above, ROGERS discussed using the pipe bombs to attack the Democratic Party headquarters in November 2020. PSR ¶ 13. Earlier, on August 16, 2020, ROGERS exchanged messages with his former brother-in-law (Nathan Fall) in which he first sent a picture of a box with five assembled pipe bombs in it (pictured below) and said, "I made these today for when shit hits the fan"; ROGERS then continued, "I figure one pipe could blow up a car pretty good etc". Fall responded, "Dont tell the protesters that lol!!!" "Haha well they are my targets," ROGERS said. A few minutes later, ROGERS added, "I want to learn how to make plastique" and "Civil war is coming":



During the search on January 15, 2021, Napa Sheriff's deputies seized multiple weapons from ROGERS's business, including four machine guns:

- A bipod-mounted, belt-fed, open-bolt MG-42 machine gun;
- An AK-47 style assault rifle with an under-fold stock, serial no. 436314;
- An AK-47 style assault rifle with a side-fold stock, serial no. K005426; and,
- An M-16 style assault rifle, serial no. 2242110.

PSR ¶ 9. The Napa County Sheriff's armorer examined all four weapons and determined that they were machine guns, as ROGERS also later admitted.

### B. Victim Impact

Representatives from the California Democratic Party informed the FBI that the Party headquarters in Sacramento targeted by ROGERS and Copeland is used for many purposes, including planning interstate travel of Party members, coordinating with the national Democratic Party, coordinating with party representatives in other states on campaigns in those states and purchasing advertising to support candidates and promote issues in California and other states. PSR ¶ 13.

The California Democratic Party submitted a Victim Impact Statements to the Court in this matter, emphasizing that the criminal conduct in this case has caused "a chilling effect on people's willingness to take an active role in the democratic process," that "employees and volunteers are still scared for their safety when they visit the Party's headquarters," and that "the Party expended significant sums of money to increase security at its headquarters . . . to protect the safety of all staff, volunteers, and visitors," among other things.

A representative from the California Democratic Party plans to attend the sentencing hearing and requests to be heard by the Court.

## III. DISCUSSION

### A. Legal Standard

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, deter others from committing similar crimes, protect the public from the defendant, and rehabilitate the defendant. *See* 18 U.S.C. § 3553(a)(2); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The statute sets forth several factors that the Court must consider in determining a just sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); *Carty*, 520 F.3d at 991. The sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment to the offender, deter the defendant and others from

committing similar crimes in the future, and protect the community from future crimes of the defendant. 18 U.S.C. § 3553(a)(2).

The Guidelines should be the starting point and the initial benchmark. *Gall v. United States*, 552 U.S. 38, 49 (2007). Though the guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

### B.     Guidelines Calculation

The parties' plea agreement sets forth the below Guidelines range. Plea Agmt. (Dkt. No. 62) ¶ 7. Although ROGERS's criminal history does not include any prior convictions, applying § 3A1.4 automatically increases ROGERS's criminal history category to VI under the Guidelines. *See* U.S.S.G. § 3A1.4(b). Under the parties' agreed-upon Guidelines calculation, the sentencing range is as follows:

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2K1.4(a)(2) | 20 |
| Terrorism Enhancement, U.S.S.G. § 3A1.4 | +12 |
| Acceptance of Responsibility, U.S.S.G. § 3E1.1 | -3 |
| Adjusted Offense Level | 29 |
| Criminal History Category | VI |
| Sentencing Range | 151-188 |

Although the government stands by the parties' agreed-upon Guidelines calculation in the plea agreement, the government does not object (and the defense did not object) to the Guidelines calculated by Probation in the PSR: a base offense level of 18 under U.S.S.G. § 2K2.1(a)(5), a four-level increase for 8–24 firearms under 2K2.1(b)(1)(B), a two-level increase for destructive devices under 2K2.1(b)(3)(B), a twelve-level increase for terrorism under 3A1.4(a), and a three point reduction for acceptance of responsibility, for a total offense level of 33:

| | |
|---|---|
| Adjusted Offense Level | 33 |
| Criminal History Category | VI |
| Sentencing Range | 235-293 |

### 1. The Terrorism Enhancement Applies

The Guidelines provide for a 12-point enhancement "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. A federal crime of terrorism is an enumerated crime "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Destruction of a building used in interstate commerce, in violation of 18 U.S.C. § 844(i), is one of the offenses enumerated in § 2332b(g)(5). Conspiracy to commit that offense, in violation of 18 U.S.C. § 844(n), is an offense that involves or is intended to promote an enumerated offense. *United States v. Mandhai*, 375 F.3d 1243, 1247–48 (11th Cir. 2004) (Section 844(n) supports application of Guidelines § 3A1.4).

In this case, ROGERS and Copeland specifically intended to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government. *United States v. Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020); *United States v. Tankersley*, 537 F.3d 1100, 1113 (9th Cir. 2008). The focus of this analysis is the intended offense itself, not the defendant's rationale. *Alhaggagi*, 978 F.3d at 700. In *Alhaggagi*, the Ninth Circuit found that, while opening six social media accounts for ISIS supporters did not support application of § 3A1.4's terrorism enhancement, other acts like "conspiring to bomb a federal facility, planning to blow up electrical sites, attempting to bomb a bridge, or firebombing a courthouse" would support that enhancement. *Id.* at 702.

In his plea agreement, ROGERS agreed that § 3A1.4 applies. Plea Agmt ¶ 7. Indeed, ROGERS's conduct satisfies § 3A1.4's requirements, as described in more detail in the discussion below about the nature and circumstances of the offense. The Court should find that § 3A1.4 applies— as the parties and Probation agree—and increase ROGERS's offense level by 12 points.

### 2. ROGERS May Be Entitled to Acceptance Points

The Guidelines provide for a three-level deduction for acceptance of responsibility under U.S.S.G. § 3E1.1. ROGERS is entitled to that deduction as the government has agreed if, at sentencing, he manifests genuine acceptance of responsibility. Though "[t]he factual inquiry required by the guidelines does not require a penetrating judicial examination of the criminal's soul," *United States v. Vance*, 62 F.3d 1152, 1158 (9th Cir. 1995), it is also true that merely pleading guilty without also expressing remorse or contrition may provide a basis for denying § 3E1.1's deduction, *United States v.*

*Rosales*, 917 F.2d 1220, 1222-23 (9th Cir. 1990) because it tends to indicate that the offender has not truly renounced the conduct for which he stands convicted, and this makes him a greater danger to the community in the future.

The Court may recall that ROGERS's admissions at the time of his guilty plea appeared somewhat reluctant: while he admitted that he had done and said all of the things set forth in the plea agreement, he hesitated as to whether what he had done was criminal. If this attitude continues to show at sentencing, it evinces a defiance that undermines true acceptance of responsibility. Accordingly, though the government has included the full deduction in its Guidelines calculation, it reserves the right to argue that the deduction under § 3E1.1 should not apply if ROGERS fails to truly accept responsibility for his actions.

### C. Plea Agreement

The parties agreed to a binding resolution under Federal Rule of Criminal Procedure 11(c)(1)(C), with a sentencing range of 84–108 months (7–9 years) of imprisonment. The Court must decide whether to accept or reject the parties' agreement. Fed. R. Crim. Proc. 11(c)(3)(A). The Court has broad discretion to accept or reject the plea agreement. *United States v. Harris*, 679 F.3d 1179, 1182 (9th Cir. 2012). The Court should consider whether the negotiated sentence "is too lenient or otherwise not in the public interest in light of the factual circumstances specific to the case." *Id.*; *see also United States v. Miller*, 722 F.2d 562, 565 (9th Cir. 1983) (categorical rules regarding acceptance or rejection of plea agreements are improper).

The government believes that the negotiated sentence is appropriate and respectfully requests that the Court accept the agreement.

### D. The Court Should Impose a 108-Month (9 Year) Sentence of Imprisonment

The government respectfully recommends that the Court impose a sentence of 108 months (9 years) of imprisonment, followed by three years of supervised release; this is at the high end of the parties' agreed-upon sentencing range in the Rule 11(c)(1)(C) agreement, but below the Sentencing Guidelines calculated by the parties and by Probation. ROGERS stands convicted and faces sentencing for the things described above that he did—not the things he thought. He has repeatedly described

himself as a political prisoner to his friends and relatives.[2] But as ROGERS well knows, he faces a substantial prison sentence because he plotted violent acts against others, and because he possessed a stockpile of illegal weapons and explosives that he contemplated using in his attacks.

The nature and circumstances in this case confirm that this was a very serious offense warranting the government's recommended sentence of imprisonment. ROGERS and Copeland targeted the headquarters of one of the United States' two major political parties following a presidential election. The party headquarters were a proxy for the government itself. And ROGERS's and Copeland's intent, as they themselves said, was to carry out violent attacks that would make members of that political party afraid to remain in office. They also intended their attacks—against one of the two major political parties and social media companies they perceived as aligned with that party—to inspire others to commit similar acts of violence against those same targets. This evinces an intent to influence or affect the conduct of government through intimidation and coercion. ROGERS and Copeland in fact contemplated that their actions would be viewed as acts of terrorism. On November 30, 2020, Copeland predicted that "we will get tagged as domestic terrorists," and ROGERS responded, "Like I care what we are labeled".

Indeed, both ROGERS and Copeland expressed anger that, in their view, the government had done little to curb the protests in the summer of 2020 while reacting harshly to the persons who staged the attack on the Capitol on January 6, 2021. This retaliatory motive is evident in Copeland's statements that he and ROGERS wanted "payback" against the government for what they perceived as the disparate treatment groups received by those on opposite sides of the political spectrum. Indeed, ROGERS said "they need to have some payback" when speaking of their plan to strike at a target affiliated with the Democratic party.

As for ROGERS's history and characteristics, ROGERS abused alcohol and both ROGERS and Copeland abused steroids. The two men spoke about steroids frequently, and in late-December 2020,

---

[2] In a January 27, 2021 video visit with his ex-wife, ROGERS said "the Democrats are going to war against me." In another call with her that same day, ROGERS pointed out that there were no federal charges against him until the new administration took over (within 12 days of his arrest, which had nothing to do with who held office before or after the inauguration), and that "it's all political." In a call with his ex-wife's sister on February 2, 2021, ROGERS repeated that "it's all politics."

they ordered multiple substances, including testosterone, oxandrolone, and methandienone from an overseas vendor. Steroids increase irritability and aggression: "People who misuse anabolic steroids report more anger than nonusers, as well as more fights, verbal aggression, and violence toward their significant others, sometimes called 'roid rage.'" [3] Copeland's own statements show that the steroids had the same mood-altering effects the studies described above found. On January 13, 2021, he told ROGERS (following another discussion about the political situation in the United States), "the roids make me very angry." During searches of ROGERS's business on January 15, 2021, and Copeland's home on January 17, 2021, agents found steroids. The agents seized the steroids they found at Copeland's home. A lab later confirmed that Copeland had both testosterone liquid and oxandrolone tablets. Agents returned to ROGERS's business in April 2021 and located and seized his steroids (he had been in custody since January, so the steroids were still where agents had seen them before). Those have not been laboratory-tested, but they also appeared to be vials of testosterone, similar to what agents seized from Copeland.

While ROGERS has no prior criminal convictions, it is notable that he was arrested on August 18, 2020 for domestic abuse, in which he and his current wife got into an altercation that became physical and spilled out into the front yard, and one of the neighbors called police. In SMS messages with his ex-wife a month later, ROGERS said, "I hate this town I'll be happier away from the n****rs etc in Berryessa I'll see beauty every day, and I'm sick of my stupid g**k neighbors". He then said, "I can't forgive them for calling the cops on my numerous times over bullshit" and "Typical Asian assholes, they only care about themselves and they're families". ROGERS's ex-wife responded, "In the neighbor's defense, if I saw some Russian lady screaming to call the police and you all buffed looking like Arnold shuffling around with her, I'd think you were being violent. . . . Hopefully you can try to control your temper so that kind of thing never happens again."

---

[3] *See* "Steroids and Other Appearance and Performance Enhancing Drugs (APEDs) Research Report," Nat'l Inst. On Drug Abuse (rev. Feb. 2018) at 14, *available at* https://www.drugabuse.gov/download/815/steroids-other-appearance-performance-enhancing-drugs-apeds-research-report.pdf (last visited July 14, 2021). The report notes that the research results may be confounded by personality traits more common among steroid abusers. In other words, it's difficult to tell whether steroids make steroid users more prone to violence, or if people who are more prone to violence tend to seek out steroids.

Finally, the need for just punishment and deterrence against political violence merits the government's recommended sentence. Whether ROGERS was a right-wing or left-wing extremist does not matter here: simply put, he was an extremist who got within a few days of committing acts of violence to try to enforce his political views on others, and that is conduct that must be condemned with severe consequences. Indeed, there is a great need for the sentence in this case to send a message to anyone who would conspire to commit any political violence.

Here, the parties agreed to a sentence of between 84 and 108 months, which is below the agreed-upon Guidelines and the Guidelines calculated in the PSR by Probation. The government agreed to a sentence in this range in view of ROGERS' lack of criminal history, and because no one got hurt and no structures were destroyed. Law enforcement intervened before—likely just a few days before—ROGERS and Copeland carried out their attack. Their offense is no less real, but (despite Copeland's efforts to enlist others) they appear to have been a conspiracy of two and timely law enforcement intervention eliminated the threat they posed.

## IV. CONCLUSION

For the foregoing reasons, the government asks that the Court accept the parties' plea agreement and sentence ROGERS to 108 months (9 years) in prison, followed by three years of supervised release on the conditions Probation recommends, and including the condition that he not use any steroids or other illegal controlled substances except with a doctor's prescription.

DATED: September 21, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

       /s/
FRANK RIEBLI
ERIC CHENG
Assistant United States Attorneys